UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

LORI JAN GOLDSTEIN            )
                             )
            Plaintiff,       )
                             )    CIVIL ACTION NO.
        v.                   )    12-11974-DPW
                             )
BRIGHAM AND WOMEN'S FAULKNER  )
HOSPITAL, INC. and           )
MARY RAY MAZAKA              )
                             )
            Defendants.      )

MEMORANDUM AND ORDER
January 23, 2015

This is an action alleging employment discrimination by
defendants Brigham and Women's Faulkner Hospital ("Faulkner")
and a Faulkner supervisor, Mary Ray Mazaka.  The plaintiff, Lori
Jan Goldstein, was a Spanish language interpreter at Faulkner
whose employment was terminated.  She alleges that the
defendants discriminated against her on the basis of race,
color, national origin, and gender, in violation of Title VII of
the Civil Rights Act of 1964, as amended, and Mass. Gen. Laws
ch. 151B, by providing unequal compensation compared to
similarly situated employees who are not members of her
protected classes, creating a hostile work environment, and
terminating her.  The defendants have moved for summary judgment
on all counts.

**I. BACKGROUND**

***A.  Factual Background***

   1.  <u>Goldstein's Employment at Faulkner</u>

Goldstein is a Hispanic female and American citizen of Honduran descent who was born in Mexico City.  She was employed as a Spanish language interpreter and language coordinator at Faulkner, a hospital in Boston, from approximately January 2001 until March 2009.  As the language coordinator, Goldstein supervised and assigned other interpreters, was involved in the hiring process for interpreters, and by her own report made the hospital more welcoming to non-English-speaking patients by increasing the size of the language services department.

As part of her employment, Goldstein had the ability to access patient records by way of the Meditech system.  Faulkner provided training for employees, including Goldstein, on patient confidentiality and compliance with the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), Pub. L. No. 104-191, 110 Stat. 1936 (1996) (codified as amended in scattered sections of Titles 18, 26, 29, and 42 of the United States Code), in accessing patient records.  Goldstein signed a confidentiality agreement in 2007 and again in 2008 that stated that her access to confidential information was limited to a

"need-to-know" basis in order to perform her job responsibilities.

Mazaka became Goldstein's supervisor in 2005. While Goldstein was under the supervision of Mazaka, she received several written warnings. In January 2008, Mazaka issued a "final written warning" to Goldstein for using the Meditech patient record system to access the medical record of a Faulkner employee, and for permitting a college student who was the son of a fellow employee to observe an interpreter's appointment with a patient. Both actions, Mazaka indicated, violated HIPAA and internal policies. In February 2009, Mazaka issued another "final written warning" to Goldstein for reporting to work impaired, with slowed and slurred speech and a lack of balance, after which she was sent home.

Goldstein faced final discipline again in 2009. In March, Goldstein used her work log-in and password to access the medical record of a patient, Etelvino Andrade, on the Meditech system. Goldstein accessed the record because she was checking to see if the patient, whom she knew personally, was in the hospital. She believed she had authorization to access the record because she had been designated as the patient's next of

kin previously.[1]  She did not access the patient record in

furtherance of her job responsibilities.

Faulkner terminated Goldstein's employment in March 2009

following the Andrade incident.  The defendants contend that

Goldstein was terminated because of her unauthorized access of

this patient record and because of her prior disciplinary

issues, as documented in the written warnings she received.

**B.**  ***Procedural History***

1.  Goldstein's Allegations of Discriminatory Conduct

Goldstein asserts that she formed a belief that she was

being discriminated against on the bases of race, national

---

[1] By Goldstein's account, one day in March 2009, an Etelvino
Andrade spoke with one of Goldstein's colleagues because he
sought to obtain Goldstein's password to access medical records.
Goldstein knew an Etelvino Andrade who had designated her as his
next of kin; over the years, Goldstein had attended his doctor's
appointments with him, assisted with his medications, and
resided with him sporadically.  Although he had at this point
removed Goldstein as his next of kin, Goldstein was unaware of
this change.

Goldstein was apparently unsure whether the inquiring
individual was indeed the Etelvino Andrade she knew.  Because
Goldstein was aware that Etelvino Andrade is a common Cape
Verdean or Portuguese name, and because she believed that there
were multiple patients in the hospital with that name based on
her work assigning interpreters, she decided to look up all of
the patients named Etelvino Andrade who were in the Meditech
system to determine if the one who requested her password was
the one whom she knew.  A colleague, Christine Escartin,
accompanied Goldstein while she performed this search.  In her
search of the Meditech system, Goldstein identified Etelvino
Andrade and reviewed his medical record to see where he was in
the hospital.

origin, and gender by Mazaka in 2007.[2] At that time, she
complained to Ed Liston, the Vice President of Behavioral
Sciences, who did not investigate the complaints; she complained
a total of seven or eight times prior to her termination in
2009.[3] She contends that her supervisor, Mazaka, gave
preferential treatment to other employees,[4] that she was paid
less than similarly situated employees who are not members of
Goldstein's protected classes, that she was not given enough
hours to be considered a full-time employee for benefits
purposes, and that she was unlawfully terminated on the basis of
her membership in certain protected classes.

_____

[2] Although Goldstein states in her deposition that she is also
pursuing a claim of religious discrimination, because she is
Jewish, she did not include such an allegation in her complaint.
[3] In her deposition, Goldstein stated that she "tried to complain
all the time, but nobody would listen." Specifically, she told
Liston, "I can't take it anymore the way I'm being treated . . .
I'm not getting the hours that would give me more money. I'm
not getting anything," and that she believed that Mazaka was
mistreating her based on her gender, national origin, and ethnic
background.
[4] Goldstein also alleged that Makaka created a hostile work
environment through three specific actions. First, Mazaka
allegedly permitted a Russian interpreter to choose with whom
she worked but did not permit Goldstein to do the same. Second,
Mazaka allegedly ignored a complaint from Goldstein about the
inappropriate attitude of a coworker, but upon receiving a
similar complaint regarding the same coworker from another
employee, Mazaka took action to ensure that they did not work
together. Finally, Goldstein alleged that Mazaka did not permit
her to attend an educational lecture on diversity in the
workforce that Goldstein organized, but did allow others to
attend.

## 2. Administrative Proceeding

Goldstein filed a complaint with the Massachusetts Commission Against Discrimination (MCAD) and the United States Equal Employment Opportunity Commission (EEOC) on November 24, 2009.[5] On Goldstein's complaint,[6] the MCAD conducted an investigation and concluded that there was a lack of probable cause for the allegations.[7] Since the defendants admitted that they had not terminated anyone outside of Goldstein's protected class for the same or similar reasons, the MCAD determined that Goldstein had made a prima facie case for discrimination based upon race and national origin in her termination. But the MCAD

---

[5] Due to a "work-sharing" agreement between the MCAD and the EEOC, a charge filed with the MCAD is effectively filed with the EEOC simultaneously. *See Leung* v. *Citizens Bank*, Civ. No. 12-11060-FDS, 2014 WL 1343271, at *3 (D. Mass. Apr. 2, 2014) (citing *Seery* v. *Biogen, Inc.*, 203 F. Supp. 2d 35, 43 (D. Mass. 2002); *Davis* v. *Lucent Techs., Inc.*, 251 F.3d 227, 230 n.1 (1st Cir. 2001)).

[6] Initially, Goldstein alleged discrimination only on the basis of race/color and national origin. She amended her complaint to add allegations of discrimination on the basis of gender in March 2012. Her MCAD complaint included additional allegations of discriminatory conduct not stated in her complaint filed with this court.

[7] There are minor discrepancies between the MCAD dismissal summary and the facts as alleged in this lawsuit. For example, the MCAD dismissal states that Mazaka became Goldstein's supervisor in 2007, rather than 2005; that the patient's name was Andrade Etelivino, rather than Etelvino Andrade; and that his record was accessed and she was dismissed in April 2009, rather than March 2009. I have used the facts as they appear in the summary judgment record, rather than as they appear in the MCAD dismissal summary.

also determined that the defendants had provided legitimate, non-discriminatory reasons for terminating her employment, and that Goldstein had failed to demonstrate that those reasons were a pretext for discrimination.

Similarly, the MCAD concluded that Goldstein had not demonstrated that she was subject to disparate treatment based upon her race, national origin, or gender. Finally, the MCAD determined that Goldstein "failed to present any information upon which a reasonable fact finder could believe that [Mazaka] is individually liable for discrimination against her based on Race, National Origin and Sex." The MCAD accordingly dismissed Goldstein's complaint on November 30, 2011.[8] The EEOC adopted the findings of the MCAD, dismissed Goldstein's complaint, and issued a right-to-sue letter on July 23, 2012.

### 3. Judicial Proceeding

Goldstein filed her initial complaint in this court on October 22, 2012 without the assistance of counsel, along with a motion to proceed in forma pauperis ("IFP"), which I granted. The early life of this case was plagued with some hurdles relating to Goldstein's IFP status and difficulties

---

[8] The dismissal letter contains two dates: it is signed and dated November 29, 2011 but stamped November 30, 2011. In their statement of undisputed facts, the defendants state that the MCAD rendered its findings and dismissed the case on November 30, 2011. Accordingly, I have used November 30 as the date.

communicating with the United States Marshals Service —
regarding service of her complaint on the defendants — and
thereafter with her counsel.  The plaintiff, through counsel,
ultimately filed her amended complaint on October 18, 2013.
Following the conclusion of discovery, the defendants filed a
motion for summary judgment on all counts of the plaintiff's
amended complaint, on which I held argument on January 21, 2015.

## II. DISCUSSION

There is no dispute that Goldstein is a member of the
protected classes to which she claims to belong: she is a
Hispanic female of Honduran descent born in Mexico, and it is on
these bases that she alleges race, color, gender, and national
origin discrimination.  The defendants contend that summary
judgment is appropriate because most of her claims are barred by
the applicable statutes of limitations, and those that are not
time-barred are unmeritorious because the plaintiff has failed
to identify any similarly situated employee as a comparator to
create a prima facie case of discrimination.  In response to the
motion, Goldstein contends that she has two claims that are not
time-barred and for which she has established the necessary
prima facie case.

## A.  Standard of Review

The purpose of summary judgment practice is "to pierce the
pleadings and to assess the proof in order to see whether there
is a genuine need for trial." *Garside v. Osco Drug, Inc.*, 895
F.2d 46, 50 (1st Cir. 1990) (citation omitted).  Summary
judgment is appropriate when, based on the pleadings, discovery,
and disclosure materials in the record, "there is no genuine
dispute as to any material fact and the moving party is entitled
to judgment as a matter of law." Fed. R. Civ. P. 56(a), (c).  A
"genuine" dispute is one that, based on the supporting evidence,
"a reasonable jury could resolve . . . in favor of the non-
moving party," and a "material" fact is one that has "the
potential to affect the outcome of the suit under the applicable
law." *Sanchez v. Alvarado*, 101 F.3d 223, 227 (1st Cir. 1996)
(citations and quotation marks omitted).

When reviewing a motion for summary judgment, I view the
facts "in the light most favorable to the non-moving party."
*Zambrana-Marrero v. Suarez-Cruz*, 172 F.3d 122, 125 (1st Cir.
1999).  If the moving party makes a showing that there is no
genuine issue of material fact, the burden shifts to the
nonmoving party to demonstrate by reference to specific provable
facts "that a reasonable jury could return a verdict for the
nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242, 248 (1986).  *See Celotex Corp. v. Catrett*, 477 U.S. 317,

324 (1986).  "[C]onclusory allegations, improbable inferences,

and unsupported speculations" are insufficient to establish a

genuine dispute of fact.  *Medina-Munoz v. R.J. Reynolds Tobacco

Co.*, 896 F.2d 5, 8 (1st Cir. 1990).  In reviewing the record

before me, I give no deference to the findings of the MCAD or

the EEOC, because the plaintiff filed an original action in this

court, rather than pursuing the full course of administrative

remedies available.  *See Brunson* v. *Wall*, 541 N.E.2d 338, 341-42

(Mass. 1989).

**B.    *Timeliness of Claims & Statute of Limitations Issues***

    1.  Background

    Goldstein filed her complaint with the MCAD and the EEOC on

November 24, 2009.  *See Leung* v. *Citizens Bank*, Civ. No. 12-

11060-FDS, 2014 WL 1343271, at *3 (D. Mass. Apr. 2, 2014)

(filing complaint with MCAD constitutes filing with EEOC).  The

MCAD rendered a lack of probable cause finding and dismissed the

complaint on November 30, 2011.  Thereafter, the EEOC adopted

the findings of the MCAD and issued a right-to-sue letter on

July 23, 2012.  Goldstein filed this lawsuit alleging violations

of both Title VII, 42 U.S.C. §§ 2000e *et seq.*, and Mass. Gen.

Laws ch. 151B on October 22, 2012.

## 2. Legal Standard

Under both Title VII and chapter 151B, a plaintiff must file an administrative complaint with the MCAD or the EEOC within 300 days of the date of the occurrence of the alleged unlawful employment practice.[9]  *See* 42 U.S.C. § 2000e-5(e)(1); Mass. Gen. Laws ch. 151B, § 5; *Tuli* v. *Brigham & Women's Hosp.*, 656 F.3d 33, 40 (1st Cir. 2011).  This limitations period may be subject to equitable tolling or to the continuing violation doctrine, which effectively serves to renew untimely discrimination claims if a related act occurred within the limitations period.  *See Davis* v. *Lucent Tech., Inc.*, 251 F.3d 227, 234 (1st Cir. 2001); *Ocean Spray Cranberries, Inc.* v. *Mass. Comm'n Against Discrimination*, 808 N.E.2d 257, 266-67 (Mass. 2004).  However, Title VII and chapter 151B differ somewhat in additional temporal limits they place on civil lawsuits.

Under Title VII, a plaintiff cannot file a federal claim until she has received a notice of right-to-sue from the EEOC, which is provided upon dismissal by the EEOC or at the request of the plaintiff after the EEOC has had the complaint for 180

---

[9] Although the charge-filing period for Title VII claims is typically 180 days, it is extended to 300 days where the state anti-discrimination agency enforces a parallel state or local law, as the MCAD does.  *See* 42 U.S.C. § 2000e-5(e)(1); *Nat'l R.R. Passenger Corp.* v. *Morgan*, 536 U.S. 101, 110 (2002).

days.[10]  *See* 42 U.S.C. § 2000e-5(f)(1); *Jorge* v. *Rumsfeld*, 404

F.3d 556, 564 (1st Cir. 2005).  Upon receiving a right-to-sue

letter, a plaintiff has 90 days to file a civil lawsuit.

42 U.S.C. § 2000e-5(f)(1).

Under chapter 151B, a plaintiff may file a claim in court

no sooner than 90 days after the filing of her MCAD complaint,

absent written permission from a commissioner, but "not later

than three years after the alleged unlawful practice occurred."

Mass. Gen. Laws ch. 151B, §§ 5, 9; *see Alston* v. *Massachusetts*,

661 F. Supp. 2d 117, 124 (D. Mass. 2009); *see also Cuddyer* v.

*Stop & Shop Supermarket Co.*, 750 N.E.2d 928, 936 n.11 (Mass.

2001) (claims under chapter 151B are "subject to two statutes of

limitations," alternatively 300 days and three years).  Unlike

under Title VII, a plaintiff need not wait for the resolution of

the MCAD investigation; the filing of a lawsuit triggers the

dismissal of the MCAD complaint if it has not already been

resolved by MCAD.  Mass. Gen. Laws ch. 151B, § 9.[11]

---

[10] A complainant may request a notice of right-to-sue prior to
the completion of an EEOC investigation, as early as 180 days
after the filing of the complaint.  *See* 42 U.S.C. § 2000e-
5(f)(1); 29 C.F.R. § 1601.28(a)(1).  If such a notice is
requested, the EEOC investigation will be closed. 29 C.F.R.
§ 1601.28(a)(3).
[11] In addition, a plaintiff who does not appeal from an adverse
decision by the MCAD cannot thereafter file an action in
superior court and seek to relitigate the allegations of

3.  Analysis

   *a. Chapter 151B Three-Year Statute of Limitations*

As a threshold matter, I find Goldstein failed to file her state claim within the three-year limitations period imposed by chapter 151B.  Goldstein was terminated in March 2009 and has not alleged any discriminatory conduct after that date.  Her lawsuit was filed in October 2012, three years and five months later.  Chapter 151B clearly requires that a lawsuit must be filed within three years of the alleged unlawful practice, even if the MCAD has not finished its review of the related complaint.  Mass. Gen. Laws ch. 151B, § 9.  Although Goldstein may have complied with the procedure and timeliness requirements for federal claims, in so doing she sacrificed her state law claims.[12]  Accordingly, I will grant summary judgment on count II, which raises the chapter 151B claims.

   *b. Timeliness of Title VII Claims*

Because Goldstein filed her MCAD/EEOC complaint on November 24, 2009, only those acts that occurred on or after January 28, 2009 – 300 days prior – may be the basis for liability.  *See Nat'l R.R. Passenger Corp.* v. *Morgan*, 536 U.S. 101, 110 (2002).

_____

discrimination de novo.  *Brunson* v. *Wall*, 541 N.E.2d 338, 341 (Mass. 1989).

[12] Goldstein does not argue that equitable tolling or any other tolling doctrine should apply to her state claims, and at argument on this matter conceded that they are time-barred.

Goldstein's termination claim falls within this period. The parties agree that some portion of Goldstein's unequal compensation claim also falls within this period. The defendants contend, however, that the remainder of her claims of a hostile work environment and disparate treatment fall outside of the limitations period, and Goldstein does not challenge this interpretation.

There is a substantial question regarding the temporal scope of Goldstein's unequal compensation claim, specifically how far back her claim[13] may run in light of relatively recent changes in the law in this area. *See, e.g.*, Lilly Ledbetter Fair Pay Act of 2009, Pub. L. No. 111-2, 123 Stat. 5 (2009) (codified as amended in scattered sections of Titles 29 and 42 of the United States Code); *see also* 42 U.S.C. §§ 2000e-5(e)(3)(B), 2000e-5(g)(1). Because I conclude that summary judgment is warranted on this claim on substantive grounds, as discussed below, I need not resolve this issue.

---

[13] Goldstein does not identify with particularity the compensation decision or decisions she considers to be discriminatory. Among the alleged adverse employment decisions that can be inferred from her complaint, however, are the initial compensation decision made when she began at Faulkner in 2001, the decision not to increase her pay when she took on the role of language coordinator, the denial of her requests to Ed Liston to increase her compensation, and the denial of her requests to Mazaka to obtain more hours so that she could qualify for employer contributions to her benefits.

*C.  Termination and Unequal Compensation Claims*

I turn now to whether the defendants are entitled to judgment as a matter of law on Goldstein's timely claims of unlawful termination and unequal compensation.

1.  Legal Standard

Goldstein's claims of discrimination rely on circumstantial rather than direct evidence.[14]  Consequently, the three-part burden-shifting framework articulated by the United States Supreme Court in *McDonnell Douglas Corp.* v. *Green*, 411 U.S. 792 (1973), provides instruction.

First, the plaintiff must establish a prima facie case of discrimination.  *See Rodriguez-Torres* v. *Caribbean Forms Mfr., Inc.*, 399 F.3d 52, 58 (1st Cir. 2005).  "Because employment discrimination cases arise in a variety of contexts, the prima facie elements must be tailored to the given case."  *Id.* (citing *McDonnell Douglas*, 411 U.S. at 802).

Second, if the plaintiff creates an inference of discrimination, "the burden of production shifts to the defendant to articulate a legitimate non-discriminatory reason for its action."  *Id.* (citing *McDonnell Douglas*, 411 U.S. at 802).  Third, if the defendant successfully removes the

---

[14] Goldstein does not point to any evidence that any manager or employee at Faulkner made any explicit reference to Goldstein's race, ethnicity, national origin, or gender.

presumption of discrimination, "the plaintiff must then demonstrate that the defendant's proffered reason was pretext for discrimination." *Id.* (citing *Reeves* v. *Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 146-47 (2000)).

Throughout the analysis, the plaintiff bears the burden of persuasion and must demonstrate "that the defendant intentionally discriminated against her" by a preponderance of the evidence. *Id.* (citing *Texas Dep't of Cmty. Affairs* v. *Burdine*, 450 U.S. 248, 253 (1981)); *see Johnson* v. *Univ. of Puerto Rico*, 714 F.3d 48, 54 (1st Cir. 2013).

In conducting this analysis at the summary judgment stage, it is not necessary slavishly to follow the shifts in production burdens; instead, the focus is "on whether the evidence as a whole is sufficient to make out a jury question as to pretext and discriminatory animus." *Fennell* v. *First Step Designs, Ltd.*, 83 F.3d 526, 535 (1st Cir. 1996); *see Reeves*, 530 U.S. at 148-49 (analysis hinges on consideration of numerous factors, "includ[ing] the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered on a motion for judgment as a matter of law"). Where the defendant has proffered a legitimate reason for an adverse decision, the

16

"ultimate burden" of showing that the defendant's actions were motivated by discrimination "lies with the plaintiff." *Aly* v. *Mohegan Council, Boy Scouts of Am.*, 711 F.3d 34, 46 (1st Cir. 2013).

## 2. Termination

To establish a prima facie case for discriminatory termination, a plaintiff "must show that (1) she was within a protected class, (2) possessed the necessary qualifications and adequately performed her job, (3) but was nevertheless dismissed and (4) her employer sought someone of roughly equivalent qualifications to perform substantially the same work." *Rodriguez-Torres*, 399 F.3d at 58; *see Santiago-Ramos* v. *Centennial P.R. Wireless Corp.*, 217 F.3d 46, 54 (1st Cir. 2000). Goldstein has demonstrated that she belongs to multiple protected classes; has contended that she increased the language services available to patients at the hospital, suggesting that she performed her job adequately (despite the warnings she received regarding improper workplace conduct); and was dismissed from her role at the hospital in March 2009. However, she falls short on producing evidence as to her replacement.

Assuming nonetheless that Goldstein could make a prima facie case, the defendants offer a legitimate reason for terminating her employment. There is clear evidence that

Goldstein accessed a patient's record without having a job-related reason for doing so, in violation of the confidentiality agreement she signed.[15]  This is supported both by an audit of the activity on Goldstein's Meditech account and by Goldstein's own description of her conduct.  In addition, Goldstein had received final written warnings on two prior occasions; when combined with her unauthorized record access, the defendants contend, these more than justified her dismissal.  On their face, the reasons offered for termination are legitimate and non-discriminatory.  *See Ruiz* v. *Posadas de San Juan Assocs.*, 124 F.3d 243, 248 (1st Cir. 1997) (defendant "need only produce enough competent evidence, *taken as true*, to enable a rational factfinder to conclude that there existed a nondiscriminatory reason for the challenged employment action").

To survive summary judgment, Goldstein must offer some evidence that the defendants' articulated reason for discharging her is a pretext, and that "the real reason was . . . discrimination." *Thomas* v. *Eastman Kodak Co.*, 183 F.3d 38, 62

---

[15] The defendants also contend that Goldstein's conduct violated the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), Pub. L. No. 104-191, 110 Stat. 1936 (codified as amended in scattered sections of Titles 18, 26, 29, and 42 of the United States Code), a statutory claim which I need not evaluate as a matter of law at this stage, since the violation of the confidentiality agreement is sufficient to justify the termination decision.

(1st Cir. 1999). "Pretext can be shown by such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." *Gómez-González* v. *Rural Opportunities, Inc.*, 626 F.3d 654, 662-63 (1st Cir. 2010) (quoting *Morgan* v. *Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997)).

Goldstein offers two arguments to this end. First, she contends that she did not violate the confidentiality agreement because she had been designated (at least in the past) as the patient's next of kin, and that she had access to the Meditech system for the purpose of looking up patient records. This argument fails. The confidentiality agreement Goldstein signed explicitly states that "[a]ccess to confidential information without a patient care/business need-to-know in order to perform my job . . . is a violation of this policy." In signing the agreement, Goldstein agreed to the statements that "I am responsible for every action that is made while using [my] password" and that "I agree not to make any unauthorized . . . inquiries . . . in the system." Goldstein has offered no explanation of a job-related purpose for accessing the patient

19

record, instead maintaining that she knew the patient personally.

Even if Goldstein had some job-related reason for the access, what matters for this analysis are "the motivations and perceptions of the employer's decisionmaker." *Bonefont-Igaravidez* v. *Int'l Shipping Corp.*, 659 F.3d 120, 126 (1st Cir. 2011); *see Woodward* v. *Emulex Corp.*, 714 F.3d 632, 639 (1st Cir. 2013) (court is "not concerned with whether the stated purpose 'is unwise or unreasonable'" but with whether it is "untruthful" (internal citation omitted)). The defendants have demonstrated that they believed that Goldstein lacked a job-related reason for accessing the patient record, and therefore that she engaged in conduct that breached the confidentiality agreement and warranted termination. Goldstein has not adduced evidence to permit the inference that the confidentiality agreement as the proffered reason for termination was - on its face - a pretext.

Goldstein next argues that reliance upon her inappropriate record access was a pretext because the colleague with whom she accessed the record, Christine Escartin, did not face any discipline at all for her conduct. In so doing, she implies that her termination was discriminatory because Escartin is not Hispanic (although she is a foreign-born female). "Disparate treatment may be 'competent proof that the explanation given for

the challenged employment action was pretextual, provided the
plaintiff-employee can make a preliminary showing that others
similarly situated . . . in all relevant respects were treated
[more advantageously] by the employer.'"  *Aly*, 711 F.3d at 46
(citing *Straughn* v. *Delta Air Lines, Inc.*, 250 F.3d 23, 43-44
(1st Cir. 2001)) (alterations in original).

   The evidence proffered by both Goldstein and the defendants
demonstrates that Goldstein and Escartin were not similarly
situated in this context.  *See Woodward*, 714 F.3d at 639 (test
for whether two individuals are similarly situated "is whether a
prudent person, looking objectively at the incidents, would
think them roughly equivalent and the protagonists similarly
situated" (internal quotation marks and citation omitted)).
First, it was Goldstein's log-in and password that were used to
access the patient record in violation of the policy, not
Escartin's.  Second, Escartin had not received any warnings or
disciplinary actions previously, whereas Goldstein had received
two.  Although Escartin's involvement in the record access could
have violated the confidentiality agreement, her password was
not used, and she did not have prior disciplinary issues.  *See*
*Ronda-Perez* v. *Banco Bilbao Vizcaya Argentaria-Puerto Rico*, 404
F.3d 42, 46 (1st Cir. 2005) (rejecting plaintiff's reliance on
more favorable disciplinary treatment of coworker who engaged in

some impermissible conduct with plaintiff because coworker "was at a lower level of responsibility than plaintiff, and was free from the other criticisms levied at plaintiff").

Even if a reasonable fact finder could conclude that Goldstein was unfairly disciplined as compared to Escartin for the improper record access, Goldstein has not pointed to any evidence that would permit a fact finder to conclude that her termination was discriminatory. *See Feliciano de la Cruz* v. *El Conquistador Resort & Country Club*, 218 F.3d 1, 8 (1st Cir. 2000); *Thomas*, 183 F.3d at 64 ("even the most blatant unfairness cannot, on its own, support a Title VII claim"). Although at this stage Goldstein need not affirmatively demonstrate a discriminatory motive, she must nonetheless present sufficient evidence that a "trier of fact can reasonably infer from the falsity of the [defendant's proffered] explanation that the employer is dissembling to cover up a discriminatory purpose." *Reeves*, 530 U.S. at 147.

Goldstein has not offered any suggestion that the defendants' reason was discriminatory, or even that it was false. In *Feliciano*, a case in which a Puerto Rican woman claimed discriminatory termination on the basis of her national origin, the First Circuit determined that the plaintiff had offered no evidence of a discriminatory reason for her

22

termination and upheld the trial court's grant of summary judgment for the defendant, because remanding would leave the jury "to guess at the reasons behind the pretext," which "would amount to nothing more than an invitation to speculate." *Feliciano*, 218 F.3d at 9 (citations omitted); *cf. Medina-Munoz* v. *R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 10 (1st Cir. 1990) (plaintiff did not present any evidence of discriminatory reason because he offered "no statistical evidence, no demonstration of discriminatory corporate policies, no instances of disparate treatment, no invidious pattern of age-related discharges or forced early retirements").

Although in some cases a showing of pretext alone is enough to deny summary judgment, here there is neither a showing of pretext nor a showing of discriminatory purpose. *See Feliciano*, 218 F.3d at 9 (order denying panel rehearing). On the record before me, I can identify no basis on which a fact finder could "reasonably . . . infer that unlawful discrimination was a determinative factor in the adverse employment action." *Thomas*, 183 F.3d at 57 (citation omitted). Because the evidence proffered by Goldstein does not raise a genuine issue of material fact, I will grant the defendants' motion for summary judgment on the discriminatory termination claim.

### 3. Unequal Compensation

Goldstein's claim that she was compensated unequally in comparison to similarly situated employees on the basis of her race, ethnicity, and national origin[16] under Title VII requires that she demonstrate "(1) [s]he is a member of a protected class; (2) [s]he met [her] employer's expectations; (3) [s]he suffered adverse employment action with respect to compensation; and (4) similarly-situated employees outside the protected class received more favorable treatment." *Prescott* v. *Higgins*, 538 F.3d 32, 41 (1st Cir. 2008). As with her termination claim, the first and second elements are arguably met. As for the third element, among the adverse employment decisions Goldstein identifies are the initial compensation decision made when she began at Faulkner in 2001, an implicit decision not to increase her pay when she took on the role of language coordinator, and the denial of her requests to obtain more hours so that she could qualify for greater employer benefit contributions. The defendants contend that none of these decisions resulted in unequal or lesser pay for Goldstein as compared to similarly situated employees, and that the employees to whom Goldstein

---

[16] Goldstein cannot maintain a gender discrimination claim for unequal compensation, because all of the comparators she uses are also female.

points to satisfy the fourth element of her prima facie case are not in fact similarly situated.

I begin by assessing the available comparators for Goldstein's claims regarding her compensation level, because a legitimate comparator is a necessary component of a disparate treatment claim under Title VII. *See Rodriguez* v. *Smithkline Beecham*, 224 F.3d 1, 8 (1st Cir. 2000). At the time of her termination in March 2009, and apparently throughout her eight-year tenure at Faulkner, Goldstein earned $20.70 per hour and was eligible for benefits.[17]

Goldstein offers two types of comparators to support her claim of unequal compensation. First, she contends that she was paid less than the language coordinator at Brigham and Women's Hospital (BWH), a separate institution. This comparison, which is based on what she heard from "[o]ther interpreter friends" whose names she could not recall at her deposition, is

_____

[17] Benefits at Faulkner are based on the number of hours worked per week. An employee is eligible to purchase medical or dental insurance through the employee benefits program if she works 16 hours or more per week. If she works between 24 and 34 hours per week, she is entitled to an employer contribution toward the cost of medical insurance, and if she works between 35 and 40 hours per week, she is entitled to the maximum employer contribution toward the cost. With regard to life and disability insurance, there is no employer contribution distinction that makes a difference above the 16-hour threshold required for eligibility for benefits.

insufficiently supported to provide any meaningful comparison.[18]
*See Garside*, 895 F.2d at 50 ("Hearsay evidence, inadmissible at
trial, cannot be considered on a motion for summary judgment.").
Goldstein's more promising comparison is to one of her fellow
Spanish interpreters at Faulkner, Escartin, whom Goldstein
supervised.  Escartin earned a starting wage of $25 per hour
when she began in 2005 and later earned $27 per hour.
The defendants rebut Goldstein's assertion that Escartin is a
similarly situated employee by explaining that she is paid as a
per diem employee, and therefore receives a higher hourly pay
because she is not eligible for benefits, as Goldstein was.
Instead, the defendants aver that the appropriate comparator is
Natasha Metelitsa, the only other benefits-eligible interpreter
at Faulkner in March 2009.  At that time, Metelitsa earned
$18.28 per hour — less than Goldstein.[19]  The defendants
therefore contend that Goldstein earned more than her colleagues
<u>when benefits eligibility is considered</u>.  In the alternative,

---

[18] Although Goldstein states in her response to the defendants'
statement of undisputed facts that the language coordinator at
BWH earned over $60,000 per year, she does not provide a
citation to the record that supports this assertion.
[19] Although there appear to have been numerous other interpreters
at Faulkner in 2009, neither party has submitted salary
information for them.  It could be inferred from the record that
the other interpreters were also paid as per diem employees.
The record indicates that the average hourly rate for per diem
interpreters in 2009 was $32.84.

they suggest that there is no truly similarly situated employee, because Goldstein was the only language coordinator at Faulkner, and thus she cannot establish a prima facie case of unequal pay.

The defendants provide no information that would demonstrate the value of the benefits available to benefits-eligible employees, such that an assessment of the total compensation package Goldstein received as compared to Escartin could be made, or other descriptive information about Metelitsa's experience, qualifications, and length of employment at Faulkner that would permit a direct comparison to Goldstein. But the ultimate burden is not on the defendants; it is on Goldstein to persuade a reasonable fact finder that there is a similarly situated employee who is not a member of Goldstein's protected class who was treated differently than her — in this case, who received greater compensation than her. *See Aly*, 711 F.3d at 46; *Ruiz*, 124 F.3d at 248. Where the plaintiff bears the burden of presenting similarly situated employees as comparators, and where the defendant has challenged that comparison with credible facts, the plaintiff must demonstrate that "[her] case and the comparison cases . . . closely resemble one another in relevant facts and circumstances." *Conward* v. *Cambridge Sch. Comm.*, 171 F.3d 12, 20 (1st Cir. 1999).

On the record before me, Escartin and Goldstein are similar in many respects. They are both foreign-born women providing Spanish interpretation services at Faulkner. They both had been employed by Faulkner for several years; Goldstein joined in 2001 and Escartin in 2005. But there are two important differences: Goldstein performed administrative responsibilities as the language coordinator to ensure that patients received the interpretation services they needed, and also served as Escartin's supervisor. Although only similarity, not identity, is "require[d] for an analogy," *Conward*, 171 F.3d at 22, Goldstein and Escartin held materially different positions at Faulkner, even leaving aside their different compensatory schemes. Thus, they are not comparable as employees for this purpose, and Goldstein has failed to make a prima facie case for unequal pay. *See Andujar* v. *Nortel Networks, Inc.*, 400 F. Supp. 2d 306, 323 (D. Mass. 2005) (fact that employees were trained by plaintiff does not render them comparators where they had different jobs at company). *Compare Acosta* v. *Harbor Holdings & Operations, Inc.*, 674 F. Supp. 2d 351, 364 (D.P.R. 2009) (dismissing plaintiff's claims of discriminatory salary revisions and fringe benefits because "Plaintiff's salary was never reduced nor was she ever demoted," and "[s]he continued to have the same benefits while employed," but denying the motion

to dismiss her claim of a discriminatory pay scale because there was evidence that she was paid less than her male predecessor while occupying the same position, and defendants had not proffered any non-discriminatory reasons for the disparity).

Even assuming that Escartin is an appropriate comparator and that she received more favorable treatment — itself a question of interpretation[20] — Goldstein has not presented evidence that the disparate treatment was a pretext for discriminatory animus. *See Fennell*, 83 F.3d at 535. Although pretext can in some cases be shown "by producing evidence that [the] plaintiff was treated differently from similarly situated

---

[20] If Escartin met the basic criteria for a similarly situated employee, there would be a genuine issue of material fact whether she received more favorable treatment than Goldstein. Neither party has provided any indication of the value of the benefits available to Goldstein (aside from the defendants' submission of the chart displaying employee and employer contributions to those benefits at different tiers) as compared to what an employee like Escartin would need to pay to purchase equivalent benefits on the private market, nor has either party presented any legal argument that the availability of those benefits should (or should not) be considered compensation for these purposes. In addition, there is no indication whether the additional management responsibilities Goldstein held would entitle her to greater or lesser compensation. It is possible that these differences could permit the inference that Goldstein should have been paid <u>more</u>, but given the mentally and physically taxing nature of actually providing interpretation services, an inference could also be made that Goldstein should have been paid <u>less</u> for performing administrative work. There is simply no evidence to guide a fact finder through this consideration. Because I conclude that Escartin is not an appropriate comparator, however, I need not engage in this inquiry further.

employees," *Garcia* v. *Bristol-Myers Squibb Co.*, 535 F.3d 23, 31 (1st Cir. 2008), where the defendant has offered a reason for that different treatment, the plaintiff must provide some evidence that would permit a reasonable inference that the reason is false and indeed a cover-up.  *See Reeves*, 530 U.S. at 147.

The defendants' proffered reason for the difference in compensation between Goldstein and Escartin is that they were paid on different pay schedules and were essentially classified as different types of employees — Goldstein's classification came with benefits eligibility, and Escartin's did not.  The defendants have not explained why they have two different pay scales, but Goldstein has not offered any suggestion that this is an untruthful or pretextual reason for the different hourly rates she and Escartin received.  *See Woodward*, 714 F.3d at 639 (concern is whether proffered reason is "untruthful"); *see also Caesar* v. *Shinseki*, 887 F. Supp. 2d 289, 299 (D. Mass. 2012) (focus in pretext inquiry is on "perception of the decisionmaker, that is, whether the employer believed its stated reason to be credible" (internal quotation marks and citations omitted)).

Further, Goldstein has not presented any evidence suggesting that the different pay scales are attributable to

some discriminatory animus.  Instead, she merely states that the disparity in hourly wages "could have been motivated by impermissible consideration of Ms. Goldstein's race and national origin."  Such conclusory allegations and unsupported inferences are inadequate to create a genuine issue meriting trial.  *See Medina-Munoz*, 898 F.2d at 8.  *Cf. Andujar*, 400 F. Supp. 2d at 323-24 (court rejected defendant's attribution of comparators' higher pay to greater longevity at company because plaintiff began at company at same time, and defendant's proper reason "[did] not explain why [comparators] were earning significantly more than [plaintiff]," but nonetheless concluded that lack of explanation was "not enough" for plaintiff "to state a claim of discrimination" where "record [was] devoid of any factual assertions which would link the pay differentials to a discriminatory animus," and granted summary judgment for defendant).  Where Goldstein has "created only a weak issue of fact as to whether the employer's reason was untrue" and there is no indication of discrimination, the defendants are entitled to summary judgment.  *See Reeves*, 530 U.S. at 148.

I consider finally Goldstein's claim regarding the number of hours she worked.  Goldstein separately contends that the denial of her requests to Mazaka for more hours to qualify for full employer contributions to her benefits was a discriminatory

decision.  By Goldstein's own account, she was limited to working thirty-four hours per week – which placed her in the mid-level employer contribution tier for benefits - and was not given credit for times when she was on-call and worked more than forty hours per week.  The defendants have stated only that Goldstein was benefits-eligible and have proffered no explanation for why any such requests were denied.  But Goldstein has not indicated that she received different treatment from any other employee in this respect.  A prima facie case under Title VII requires some evidence of "an adverse employment action with respect to compensation" and of more favorable treatment given to similarly situated employees who are not members of the protected class.  *See Prescott*, 538 F.3d at 41; *see also Reeves*, 530 U.S. at 148-49.  Goldstein has made no such showing here.  *Cf. Andujar*, 400 F. Supp. 2d at 323-24.

In sum, a reasonable fact finder could not conclude that Goldstein was treated differently from other employees in her compensation at Faulkner because of her race, ethnicity, or national origin.  The defendants are accordingly entitled to summary judgment on the Title VII claims alleged in Count I.[21]

---

[21] I note that even if Goldstein's claims survived, Mazaka would be entitled to summary judgment because "there is no individual employee liability under Title VII."  *Fantini* v. *Salem State Coll.*, 557 F.3d 22, 30 (1st Cir. 2009).

### III. CONCLUSION

For the reasons set forth above, I GRANT the defendants'
motion for summary judgment, Dkt. No. 39.

/s/ Douglas P. Woodlock
DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT